# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:24-cr-00068 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | James E. Grimes Jr. |
| LEON BIAS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:23-cr-00103 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Amanda M. Knapp |
| JACARLO FRIESON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

In unrelated cases, Defendants Leon Bias and Jacarlo Frieson move to dismiss
the indictments separately charging each of them with being felons in possession of
a firearm (and, in the case of Mr. Frieson, ammunition) in violation of federal law.
Each argues that this prohibition violates his Second Amendment rights.  For the
reasons that follow, the Court **DENIES** Defendants' motions.

## FACTUAL BACKGROUND

Because these cases involve the same constitutional question, the Court considers that legal question together in the interest of judicial economy.  It does so against the following background in each separate case.

### A. *United States v. Bias* (No. 1:24-cr-68)

Defendant Leon Bias was born in Cleveland, Ohio in 1992.  (*Bias* ECF No. 6, PageID #12.)  At the age of 18, in September 2011, he was charged in State court with aggravated robbery, a first-degree felony.  (*Id.*, PageID #14.)  In January 2012, he was convicted and received a three-year sentence.  (*Id.*)  In June 2013, Mr. Bias sought judicial release, which was denied due to his negative institutional summary report.  (*Id.*)  However, less than a month later, in July 2013, he was granted judicial release and placed on two years of probation.  (*Id.*, PageID #14–15.)

In January 2015, the State indicted Mr. Bias when he was 22 years old, and still on probation, on two counts of kidnapping, one count of abduction, and one count of domestic violence.  (*Bias* ECF No. 19-13.)  Mr. Bias pled guilty in March 2015 to domestic violence, a first-degree misdemeanor and received a sentence of probation for one year.  (*Bias* ECF No. 6, PageID #15.)  As part of the plea agreement, the State dropped the felony kidnapping and abduction counts.  (*See id.*)

Eight months later, while still on probation for these convictions, the State indicted Mr. Bias for numerous drug-related offenses.  (*Bias* ECF No. 19-8.)  In November 2015, Mr. Bias pled guilty to two counts of drug trafficking.  (*Bias* ECF No. 6, PageID #16; ECF No. 19-7.)  Specifically, Mr. Bias pled guilty to drug trafficking with a juvenile specification, a fourth-degree felony, and a drug trafficking

2

offense with juvenile, firearm, and schoolyard specifications, a third-degree felony. (*Bias* ECF No. 6, PageID #16; *Bias* ECF No. 19-7.)  For these offenses, the State court sentenced Mr. Bias to nine months in prison and terminated probation for his January 2012 and March 2015 convictions.  (*Bias* ECF No. 6, PageID #15–16.)

Just over a year after being released from prison, in October 2017, Mr. Bias was charged with having weapons while under disability, a third-degree felony.  (*Id.*, PageID #16.)  Then, in July 2018, Mr. Bias was indicted again.  Ultimately, he pled guilty in December 2018 to two third-degree felonies, one for having weapons under disability and one for attempted felonious assault.  (*Id.*; *Bias* ECF No. 19-4.)  The underlying facts in this case include waving a gun around, discussion of using a potato as a silencer, and threatening to kill his mother and her 10-year-old grandson. (*See* ECF No. 19-3, PageID #106.)  The State trial court sentenced him to one year in the first case and two years in the second.  (*Bias* ECF No. 6, PageID #16.)

In August 2023, the State indicted Mr. Bias for, among other things, having weapons while under disability.  (*Id.*)  In March 2024, the United States indicted Mr. Bias in this case for possessing a firearm as a felon—an Ewbank caliber semi-automatic pistol—in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (*Bias* ECF No. 1.)  In May 2024, based on the State case docket, Ohio dismissed the charges against Mr. Bias, leaving this federal indictment as the sole felon-in-possession charge Mr. Bias faces arising from the events of August 16, 2023.

In summary, Mr. Bias pled guilty on five separate occasions to a total of seven criminal counts, six of which were felonies.  His most recent conviction came in

December 2018, resulting in a two-year prison sentence.  As a result of his criminal convictions, Mr. Bias has been incarcerated, in detention, or under judicial supervision for about half of his adult life.

While detained in this case, Mr. Bias was involved in a fight involving several detainees.  (*Bias* ECF No. 27.)  Along with two others, Mr. Bias was identified as an alleged perpetrator in this incident, and corrections officers recovered a knife from Mr. Bias.  (*Id.*)  On another occasion, corrections officers recovered a homemade knife from his bunk.  (*Bias* ECF No. 25.)

### B. *United States v. Frieson* (No. 1:23-cr-103)

Defendant Jacarlo Frieson was born in Cleveland, Ohio in 1993.  (*Frieson* ECF No. 5, PageID #11.)  In December 2011, at age 18, Mr. Frieson was initially charged in State court with robbery, a second-degree felony.  (*Id.*, PageID #14.)  He pled guilty to assault, a first-degree misdemeanor.  (*Id.*)  The State trial court issued a four-month suspended sentence and placed Mr. Frieson on probation for one year, which was terminated after less than four months due to violations.  (*Id.*, PageID #14–15.)  As a result of the violations, Mr. Frieson was given an additional eighteen months of probation.  (*Id.*, PageID #15.)  Ten months later, he again violated probation and was ordered to serve four months in jail.  (*Id.*)

In January 2012, Mr. Frieson, still 18 years old, was indicted on four charges and later pled guilty to one fifth-degree felony, drug trafficking.  (*Id.*)  He was placed on probation for one year, during which the record shows violations.  (*Id.*)  At age 19, only ten months after being placed on probation, Mr. Frieson was charged with and convicted of attempted drug possession, a first-degree misdemeanor, and sentenced

4

to 68 days in jail. (*Id.*, PageID #16.) At age 22, Mr. Frieson pled guilty to resisting arrest, a first-degree misdemeanor, for which the State trial court issued a fine and 180-day jail sentence, with 90 days of that sentence suspended. (*Id.*)

Just over a month later, Mr. Frieson was charged with aggravated assault, a fourth-degree felony, and he pled guilty in January 2016. (*Id.*) While serving time in jail, the record shows that Mr. Frieson was involved in a physical altercation with another inmate. (*Frieson* ECF No. 21-1, PageID #106–08.) The altercation resulted in the other inmate sustaining numerous injuries, which required hospitalization and surgery to reconstruct his jaw. (*Id.*, PageID #107–08.) Consequently, in February 2016, Mr. Frieson was sentenced to a fourteen-month prison term. (*Frieson* ECF No. 5, PageID #16.)

In May 2016, while still incarcerated, Mr. Frieson was indicted for aggravated burglary, two counts of felonious assault, domestic violence, and violating a protection order—stemming from conduct in September 2015, before his incarceration. (*Id.*, PageID #16–17.) According to the record, these charges resulted from Mr. Frieson attacking his brother, who sustained an injury requiring stitches. (*Frieson* ECF No. 21-3, PageID #124–25.) Mr. Frieson pled guilty in the case to violating a protection order, a third-degree felony, and to domestic violence, a first-degree misdemeanor. (*Frieson* ECF No. 5, PageID #17.) The State trial court sentenced Mr. Frieson to two years of probation; however, Mr. Frieson remained incarcerated for the aggravated assault conviction. (*Id.*)

5

At age 26, in December 2019, Mr. Frieson was indicted for having weapons under disability, receiving stolen property, carrying concealed weapons, and improperly handling firearms in a motor vehicle.  (*Id.*, PageID #18.)  He pled guilty to receiving stolen property, a fourth-degree felony, and having weapons under disability, a third-degree felony.  (*Id.*)  Initially, the State trial court sentenced him to two years of probation but later terminated that probation in response to another criminal conviction.  (*Id.*)

In September 2020, at age 27, Mr. Frieson was indicted for having weapons under disability, improperly handling firearms in a motor vehicle, and carrying concealed weapons.  (*Id.*, PageID #18–19.)  In July 2021, he pled guilty to one count of attempted possession of weapons under disability and one count of carrying concealed weapons, both fourth-degree felonies.  (*Id.*, PageID #19.)  The State trial court imposed a sentence of nine months on each count, which ran concurrently.  (*Id.*)

On February 23, 2023, a federal grand jury indicted Mr. Frieson in this case with two counts of possessing firearms and ammunition as a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (*Frieson* ECF No. 1.)

In summary, since December 2011, Mr. Frieson has eight convictions on a total of eleven criminal counts, eight of which are felonies.  As a result of his convictions, Mr. Frieson's time incarcerated, detained, or under judicial supervision spans about half of his adult life.  His most recent conviction came in September 2020 and was a weapons offense based on his status as a felon, as was his immediately prior

6

conviction in May 2020. Before that, Mr. Frieson's next most recent felony conduct for which he was convicted came in 2015 for aggravated assault.

## STATEMENT OF THE CASE

In each of their individual cases, Defendants filed motions to dismiss the indictment, arguing that "Section 922(g)(1)'s total lifetime ban on . . . possessing a firearm governs conduct covered by the Second Amendment and is inconsistent with this Nation's historical tradition of firearm regulations." (*Bias* ECF No. 17, PageID #54; *Frieson* ECF No. 18, PageID #62.) The United States opposes each Defendant's motion by drawing on Supreme Court and Sixth Circuit precedent and on the Court's prior decisions on the issue, as well as relying on the nation's history of gun regulation. (*See Bias* ECF No. 19, PageID #58–91; *Frieson* ECF No. 21, PageID #67–99.)

The parties filed various notices of supplemental authority. (*Bias* ECF No. 20; *Bias* ECF No. 21; *Bias* ECF No. 24; *Frieson* ECF No. 22; *Frieson* ECF No. 23; *Frieson* ECF No. 26.) On June 27, 2025, the Court heard oral argument on the motions and took the matter under advisement.

## GOVERNING LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Under the Fifth and Sixth Amendments, an indictment must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend." *Hamling v. United States*, 418 U.S. 87, 117 (1974). A defendant may move

to dismiss a defective indictment for "failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  On a motion to dismiss, the Court must read the indictment "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications."  *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).  A defendant may move to dismiss an indictment for failure to state an offense on the basis that the "statute apparently creating the offense is unconstitutional."  *United States v. Rathbun*, 771 F. App'x 614, 623 n.8 (6th Cir. 2019) (quoting *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973)).

### A.      Nature of the Challenge

At oral argument, counsel for Defendants clarified that they bring as-applied challenges to the constitutionality of 18 U.S.C. § 922(g)(1) and facial challenges for purposes of preserving the issue for appeal.  A law is facially unconstitutional if "no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U. S. 739, 745 (1987).  In contrast, an as-applied challenge tests only whether the contested "law is unconstitutional as enforced against the [party] before the court" based on the discrete facts in the case.  *Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013).

"Facial challenges are disfavored."  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  "The 'usual judicial practice' is to address an as-applied challenge before a facial challenge . . . ."  *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 327 (6th Cir. 2009) (en banc) (citation omitted).  However, the Sixth Circuit has already rejected a facial challenge to Section 922(g)(1), holding that it may be constitutionally applied in some instances.  *See United States v.*

8

*Williams*, 113 F.4th 637, 657 (6th Cir. 2024).  So has this Court.  *United States v. Berry*, 723 F. Supp. 3d 567, 573 (N.D. Ohio 2024), *aff'd*, No. 24-3769, 2025 WL 1082376 (6th Cir. Apr. 10, 2025).  These decisions prove fatal to Defendants' facial attacks on the statute.

### B.    Second Amendment Standard

Previously, the Court analyzed in depth the Supreme Court's Second Amendment precedents in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago, Illinois*, 561 U.S. 742 (2010), and *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), as well as other case law discussing the constitutionality of Section 922(g)(1) and the history and tradition of federal firearms regulation.  *See Berry*, 723 F. Supp. 3d at 580–92; *see also United States v. Hostettler*, 729 F. Supp. 3d 756, 761–62 (N.D. Ohio 2024).  The Court relies on its prior analysis in *Berry*, though it does not repeat it here in its entirety.

### B.1.   Key Determinations in *Berry*

For present purposes, based on the text of the Second Amendment and the history and tradition of federal firearms regulation, in its ruling in *Berry* the Court made four key determinations:

*First*, "[f]or most of our history . . . the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens."  *Berry*, 723 F. Supp. 3d at 586–87 (quoting *Heller*, 554 U.S. at 625).  In fact, federal law historically expanded access to firearms.  *See Range v. Garland*, 69 F.4th 96, 104 (3d Cir. 2023) (en banc).  Not until the New Deal era did Congress enact "the first major federal firearms law" as an exercise of its taxing power, the National Firearms Act.

9

*Heller*, 554 U.S. at 637 (Stevens, J., dissenting).  And the Gun Control Act of 1968 enacted the statute from which Section 922(g)(1) descends.

*Second*, despite the historical expansion of access to gun rights, the Nation's history also embodies a tradition of disarming individuals, at least temporarily, who possess some permissible disqualifying characteristic—such as dangerousness. *Berry*, 723 F. Supp. 3d at 589–90, 592.  A dangerous individual is one "whose gun possession threatens others."  *Id.* at 590 (canvassing authority).  In Section 922(g)(1), Congress chose to make a prior felony conviction disqualifying for firearm possession. But using felon status as a proxy for dangerousness is both under- and over-inclusive. *Id.*  Under *Bruen*, using felon status as a proxy for dangerousness requires analyzing whether the statute presents a "distinctly similar" restriction as the history of disarming dangerous individuals that justifies the statute's burden on the right of armed self-defense.  *Id.*  As noted below, the Supreme Court has since refined this aspect of the analysis.

*Third*, "the historical record generally shows that laws providing for disarmament of particular individuals were delimited in time or afforded them a means for restoration of the right to keep and bear arms."  *Id.* at 592.  Simply put, "none of the historical regulations . . . permanently disarm a group of people."  *Id.* (quoting *United States v. Williams*, 718 F. Supp. 3d 651, 677 (E.D. Mich. 2024)).  Even the sweeping Gun Control Act of 1968, which criminalized firearm ownership after a felony conviction, "afforded felons a pathway to restoration of the right to bear arms." *Id.* at 588 (quoting 18 U.S.C. § 925(c)).

10

*Fourth*, in *Berry* the Court noted that the United States bears the burden of "affirmatively prov[ing] that [Section 922(g)(1)] is part of the historical tradition" that delimits the outer bounds of the right to keep and bear arms.  *Id.* at 581 (quoting *Bruen*, 597 U.S. at 19).  As discussed below, subsequent decisions affect this analysis.

### B.2.    Subsequent Developments

After *Berry*, the Supreme Court decided *United States v. Rahimi*, 602 U.S. 680 (2024), which rejected a facial challenge to a conviction under a different subsection of the statute at issue.  Additionally, the Sixth Circuit decided *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), among other cases addressing the constitutionality of charges under Section 922(g)(1).

### B.2.a. *Rahimi*

In *Rahimi*, the Supreme Court took up the constitutionality of 18 U.S.C. § 922(g)(8), which prohibits a person subject to a domestic violence restraining order from possessing a firearm in certain circumstances and determined that this statute "fits comfortably within" the Nation's tradition of "preventing individuals who threaten physical harm to others from misusing firearms."  602 U.S. at 690.  This case represented the first time the Supreme Court applied *Bruen*'s two-step framework.  *United States v. Gaites*, 118 F.4th 822, 825 (6th Cir. 2024).  As relevant here, the Supreme Court reiterated that *Bruen*'s historical inquiry does not require a challenged regulation to share a "historical twin" or that it be a "dead ringer."  *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30).  Instead, to pass constitutional muster, the law must be a "historical analogue" that "comport[s] with the principles underlying the Second Amendment."  *Id.* (quoting *Bruen*, 597 U.S. at

11

30); *id.* at 699–700.  At bottom, the appropriate analysis considers whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition.  *Id.* at 692 (citing *Bruen*, 597 U.S. at 26–31).

Based on the history and tradition of surety laws and "going armed" laws, which represented "two distinct legal regimes . . . that specifically addressed firearms violence . . ." and together support disarming those who "pose[] a clear threat of physical violence to another," the Supreme Court rejected a facial challenge to the statute.  *Id.* at 694–95 & 698.  "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment."  *Id.* at 702.  In reaching this conclusion, the Supreme Court emphasized the temporary nature of the restriction on the fundamental constitutional rights under the Second Amendment that the statute placed on the defendant in that case.  *Id.* at 699.

### B.2.b. Sixth Circuit Precedent

Since *Berry*, and after the Supreme Court decided *Rahimi*, the Sixth Circuit upheld the constitutionality of Section 922(g)(1) under the Second Amendment and issued other rulings addressing charges under Section 922(g)(1).

### B.2.b.i. *Williams*

In *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), the Sixth Circuit took up its first case bringing a constitutional challenge following *Bruen*.  In doing so, it began by examining pre-*Bruen* Circuit precedent and determined that *Bruen*'s history-and-tradition methodology displaced those prior precedents.  *Id.* at 645–48.

12

Analyzing the text of the Second Amendment, the court held that the right to keep and bear arms refers to "a liberty that predated the Bill of Rights," which the Second Amendment merely codified as a right that existed before ratification of the Bill of Rights and declared shall not be infringed. *Id.* at 648–49 (citation omitted). Further, the court recognized that this right "of the people" does not differentiate between felons and non-felons. *Id.* at 649. Therefore, the Second Amendment presumptively protects the right to keep and bear arms. *Id.*

To determine whether Section 922(g)(1) impermissibly burdens that right, the *Williams* Court turned to *Bruen*'s second step—"whether [the] burden is consistent with the principles underpinning our historical tradition of regulating firearms." *Id.* at 650 (citing *Rahimi*, 602 U.S. at 692). The Sixth Circuit's examination of history and tradition found support for disarmament of persons and classes "deemed to be dangerous." *Id.* at 657. "Each time, however, individuals could demonstrate that their particular possession of a weapon posed no danger to peace." *Id.*

In an as-applied challenge to Section 922(g)(1), the Sixth Circuit directed district courts to undertake a fact-dependent dangerousness inquiry that focuses on each individual's specific characteristics. *Id.* at 657 & 660. This inquiry takes into account a person's entire criminal record (and other relevant considerations), not just the predicate offense for the charge under Section 922. *Id.* at 657–58 & n.12; *see also id.* at 660. Though largely *obiter dicta*, the court outlined three categories of offenses that generally speak, to varying degrees, to an individual's dangerousness. *Id.* at 658–59 ("[C]ertain categories of past convictions are highly probative of

13

dangerousness, while others are less so."). These categories include: (1) dangerous and violent crimes against a person, such as murder, rape, assault, and robbery; (2) crimes that place a person's safety at risk, justifying a finding of danger, such as robbery or drug trafficking; and (3) non-violent offenses, including various fraud and other white-collar crimes. *Id.* at 658–59. Offenses in the first category carry a strong presumption of dangerousness in light of the history for punishment of them. *Id.* at 658.

Applying its analysis, the Sixth Circuit rejected an as-applied challenge in *Williams*. *Id.* at 661–62. "History shows that governments may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't." *Id.* Because of the defendant's criminal record, the court easily agreed that he was dangerous, justifying his disarmament. *Id.* at 662.

### B.2.b.ii. Other Sixth Circuit Decisions

In cases following *Williams*, the Sixth Circuit has built on its historical analysis and upheld convictions under Section 922 in the face of other as-applied challenges. For example, in *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024), the court recognized that the Nation's history supports disarming those on parole, probation, or supervised release. *Id.* at 801–02. There, the defendant's history of charges for driving under the influence over an eight-year period, resulting in four convictions, one of which involved a motor-vehicle accident, showed that he "pose[d] a danger to public safety." *Id.* at 804. Moreover, he possessed a firearm while on probation. *Id.* The Sixth Circuit analyzed the Nation's history and traditions going

back to the Founding, acknowledging that "forfeiture of the estate, goods, or chattels upon conviction was common during the founding era." *Id.* at 802 (collecting treatises and legislation).  As further justification, the Sixth Circuit reasoned that, "[a]fter conviction, the state's interest in protecting the public is even higher, especially given rates of recidivism." *Id.* (citing *Samson v. California*, 547 U.S. 843, 853–54 (2006)). Therefore, the Sixth Circuit determined that a "temporary deprivation of [the defendant's] Second Amendment right as a part of his probation for his felony offense thus comports with the historical tradition of pretrial incarceration." *Id.*

In *United States v. Gailes*, 118 F.4th 822 (6th Cir. 2024), the Sixth Circuit rejected a challenge to the constitutionality of Section 922(g)(9), which prohibits those convicted of domestic violence misdemeanors from possession of a firearm.  In doing so, the court recognized that prior misdemeanor convictions for domestic violence can justify an individual's disarmament.  *Id.* at 829.

In *United States v. Morton*, 123 F.4th 492, 499 (6th Cir. 2024), the Sixth Circuit rejected a challenge to Section 922(g)(1) as applied to a defendant who had a criminal history that included shooting at a prior girlfriend and her family and assault in a domestic incident.

And in *United States v. Risner*, 129 F.4th 361, 366–68 (6th Cir. 2025), the Sixth Circuit rejected a challenge to Section 924(c)(1) by relying on the first step in the analysis set forth in *United States v. Greeno*, 679 F.3d 510, 517–18 (6th Cir. 2012), placing *Risner* in tension with *Williams*, 118 F.4th at 645–46.  Additionally, *Risner* rejected a facial challenge to the constitutionality of Section 922(g)(1) after the United

States dismissed that charge, making the discussion on that issue largely *obiter dicta* in any event. 129 F.4th at 365.

### B.3. Greater Penalties

The United States invites the Court to reconsider whether the lesser restriction of disarmament—under Section 922(g)(1)—is permissible because greater penalties—capital punishment and estate forfeiture—were both permissible at the Founding. (*Bias* ECF No. 19, PageID #61; *Frieson* ECF No. 21, PageID #70.) Of note, since the United States raised that argument in these cases, the Sixth Circuit stated in *Williams* that the "question is unsettled. Felons, after all, don't lose other rights guaranteed in the Bill of Rights even though an offender who committed the same act in 1790 would have faced capital punishment. No one suggests that such an individual has no right to a jury trial or be free from unreasonable searches and seizures." *Williams*, 113 F.4th at 658. On the records before the Court in these cases, the Court need not further consider this question, as the dangerousness inquiry—as laid out using the methodology of *Bruen*, refined in *Rahimi*, and applied in *Williams* and *Berry*—disposes of both motions to dismiss.

\*　　\*　　\*

In summary, the Sixth Circuit has largely agreed with the reasoning in *Berry*, reinforcing the constitutionality of disarming dangerous individuals, at least for a time—provided that they have an opportunity to show otherwise. *See Williams*, 113 F.4th at 663. In the context of an as-applied challenge, the determination whether a person is dangerous such that the government may lawfully disarm him, notwithstanding the guarantee of the Second Amendment, requires a fact-specific

16

inquiry into the defendant's criminal record and other circumstances.  *Id.* at 657–58 & n.12, 660; *Goins*, 118 F.4th at 804–05.

**ANALYSIS**

Under federal law, it is unlawful for any person "who has been convicted in any court of" a felony, to "possess in or affecting commerce[] any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g)(1).  Put simply, under federal law, "a person who is convicted of a felony is prohibited from possessing firearms." *United States v. Bean*, 537 U.S. 71, 74 (2002).  Defendants challenge the constitutionality of the permanence of their disarmament under this statute, arguing that their prosecution for possessing a gun as a felon is inconsistent with the fundamental rights that the Second Amendment secures.  The Court addresses the application of the statute to each Defendant.

## I.    As Applied to Mr. Bias

Although proper analysis involves examination of the totality of the facts and circumstances to determine the constitutionality of a person's disarmament for a time, *Williams*, 113 F.4th at 657 & 660, the Court need not plumb the depths of Mr. Bias's background because more recent and discrete events answer the challenge he raises.  In 2018, Mr. Bias was convicted for attempted felonious assault and having weapons under disability, a conviction which involved waving a gun around and threatening to kill others. (*Bias* ECF No. 6, PageID #15; *Bias* ECF No. 19-3, PageID #106; *Bias* ECF No. 19-4.)  For this offense, committed when Mr. Bias was 25 years old, he received a two-year prison sentence. (*Bias* ECF No. 6, PageID #16.)  Just

17

three years after his release from prison on July 31, 2020, Mr. Bias was charged with having weapons while under disability, among other things, in the events giving rise to this case.  (*Id.*)

"[T]here is little debate that violent crimes are at least strong evidence that an individual is dangerous, if not totally dispositive on the question." *Williams*, 113 F.4th at 658.  Mr. Bias's conviction for attempted felonious assault provides strong evidence of his dangerousness for Second Amendment purposes.  Indeed, assault presents an offense justifying disarmament for a time.  *See Berry*, 723 F. Supp. 3d at 570–71, 587 & 591.  Even without more, this conviction supplies sufficient evidence that he "pose[d] a clear threat of physical violence to another." *Rahimi*, 602 U.S. at 698.  This threat of physical violence to others justifies his disarmament during a period extending through his arrest in this case.  Because temporary disarmament of felons for assault is consistent with the Nation's history and tradition, as well as Sixth Circuit precedent, the Court determines that Mr. Bias's as-applied challenge to Section 922(g)(1) fails.  Even without more, this record easily confirms the constitutional application of Section 922(g)(1) to Mr. Bias.

## II.    As Applied to Mr. Frieson

Similarly, a discrete portion of the record in Mr. Frieson's case confirms constitutional application of Section 922(g)(1) to him, *Morton*, 123 F.4th at 499 (quoting *Williams*, 113 F.4th at 659–50), without the need to consider the permanence of the statutory disabiliy, *see Berry*, 723 F. Supp. 3d at 591.  Because of Mr. Frieson's history of status-based weapons convictions, his case requires tracing

18

the lawfulness of his disarmament back a little further to his last substantive offense and the events since.

### II.A.   Criminal Record

Because Mr. Frieson's "criminal record shows that he's dangerous, his as-applied challenge fails." *Williams*, 113 F.4th at 662.  In November 2015, at the age of 22, Mr. Frieson was arrested.  (ECF No. 5, PageID #16.)  Ultimately, he pled guilty to aggravated assault, a fourth-degree felony, and received a sentence of fourteen months in prison.  (*Id.*)  He completed that sentence in 2017 and entered community control for his aggravated burglary conviction, which came after his conviction for aggravated assault but occurred earlier in time.  (*Id.*, PageID #17.)  Supervision did not go well, and Mr. Frieson was found guilty of probation violations.  (*Id.*)  This conduct demonstrates continuing dangerousness justifying Mr. Frieson's disarmament through his arrest in December 2019.  *See Berry*, 723 F. Supp. 3d at 570–71, 587 & 591.  That arrest resulted in weapons charges and a conviction in 2020 for which he received a sentence of two years on community control.  (*Id.*, PageID #18.)

Due to a new charge of having weapons under disability in 2020, his sentence of community control was revoked, and on July 28, 2021, Mr. Frieson received a sentence of nine months in prison.  (*Id.*, PageID #18–19.)  Again, this conviction came sufficiently close in time to events establishing Mr. Frieson's dangerousness as to justify his disarmament at the time of this offense.  Then, less than a year after his release from prison, Mr. Frieson was indicted in this case.  At the time, he was on supervision.  (ECF No. 13, PageID #40.)  Without assessing the nature and

circumstances of the offense that led to his arrest in this case, continuing disarmament through the date of the offense for which he is federally charged is consistent with the history and tradition of firearms regulation for felons on supervision.  *See Goins*, 118 F.4th at 807 (Bush, J., concurring) (suggesting that the defendant's "conviction for illegal possession of a firearm may be upheld simply because [the defendant] was on probation at the time of his offense").

"To a greater or lesser degree, it is always true of probationers . . . that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'"  *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).  For this reason, the Court determines that Mr. Frieson's status on post-conviction supervision weighs in favor of his disarmament consistent with the Second Amendment.  *Bruen*, 597 U.S. at 22.

### II.B.  The Magistrate Judge's Detention Decision

At oral argument, Defendant argued that the Magistrate Judge's determination that Mr. Frieson be detained pending trial as a flight risk supports Mr. Frieson's lack of dangerousness.  In this case, the Magistrate Judge determined that the United States proved "[b]y a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required."  (ECF No. 13, PageID #39.)

But the record also shows that the Magistrate Judge went further, noting that "the defendant's history of violent and weapons crimes and extensive history of non-appearance  and  non-compliance  with  court-ordered  conditions  weigh  in  favor  of

detention." (*Id.*, PageID #40.)  Further, while the Magistrate Judge determined that "the defendant's history of violent crimes is more remote, his more recent history of crimes involving weapons, non-compliance, and non-appearance suggest dangerousness and weigh in favor of detention." (*Id.*)

Even taking the detention decision as based only on a risk of flight, though the record leaves doubt on that point, such a finding does not bear on Defendant's motion to dismiss the indictment.  After all, detention under Section 3142 fundamentally addresses whether a court can craft conditions to ensure a person's appearance and the safety of any person or the community pending trial—a very different determination than whether a person may be sufficiently dangerous as to justify temporary disarmament consistent with the Second Amendment.  When it recognized that "[d]istrict courts are well-versed in addressing challenges like [dangerousness determinations]," *Williams*, 113 F.4th at 660, the Sixth Circuit merely reaffirmed that the types of decisions that lie at the heart of Second Amendment challenges fall within core judicial competencies akin to other types of determinations courts routinely make.

## III.  Permanence

Regarding Section 922(g)(1)'s permanency—in light of Congress's functional repeal of Section 925(c)—in an appropriate case the absence of relevantly "similar historical regulations permanently disarming a person without the opportunity for restoration points out an inconsistency with the Second Amendment that might require relief." *Berry*, 723 F. Supp. 3d at 592.  But as was the case in *Berry*, these cases do not present such circumstances.  "[T]he background of each Defendant before

21

the Court places him among the group of dangerous persons whom the government may disarm, at least on a temporary basis, and nothing suggests for [either] Defendant that the appropriate temporary period of disarmament has reasonably passed." *Id.*  Moreover, at oral argument, counsel for Mr. Bias acknowledged that there was no evidence in the record that Mr. Bias pursued State or federal remedies in this regard.  In short, these cases do not "present an appropriate occasion to identify or consider the many difficult questions under the Second Amendment that lie ahead either generally or for . . . these Defendants." *Id.*  Those questions remain for another day.

## CONCLUSION

For all these reasons, the Court determines that the United States may enforce Section 922(g)(1) against Mr. Bias and Mr. Frieson consistent with the Second Amendment.  Therefore, the Court **DENIES** Defendants' motions to dismiss the indictments against them.  (*Bias* ECF No. 17; *Frieson* ECF No. 18.)

**SO ORDERED.**

Dated:  July 14, 2025

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio

22